## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 24-cr-402 (TNM)** |
| | : | |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| **BRANDON BARNHILL,** | : | |
| | : | **40 U.S.C. § 5104(e)(2)(D)** |
| **Defendant.** | : | **(Disorderly Conduct in** |
| | : | **a Capitol Building)** |
| | : | |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| | : | **(Parading, Demonstrating, or Picketing in** |
| | : | **a Capitol Building)** |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Brandon Barnhill has agreed to plead guilty to two second degree misdemeanors in violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Barnhill to 21 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.[1]

---

[1] Barnhill traveled through the Capitol with Gabriel Robin. *See United States v. Gabriel Robin,* 24-cr-346 (TJK). The Court scheduled Robin's sentencing hearing for December 16, 2024. The government recommended an identical sentence for Robin.

I.    **Introduction**

Barnhill, 24 years-old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

Barnhill has agreed to plead guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by Barnhill's decision to enter the Capitol after participating in the riot and observing the chaotic scene on the Capitol's West Front. When Barnhill arrived on Capitol grounds, he described the scene "as calm, until it wasn't." Barnhill observed rioters yelling at officers and felt the effects of chemical irritants in the air. Despite indications around him of the developing riot, Barnhill did not leave Capitol grounds. Instead, he climbed to the Upper West Terrace and entered the Capitol through the Upper West Terrace door at 2:45 p.m. Barnhill moved through the Capitol with a friend and smoked a substance in the East Foyer before exiting the Capitol through the East Rotunda Doors at 2:53 p.m. Barnhill remained on Capitol grounds and spent over two hours at the Capitol during the January 6 riot.

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

During a subsequent interview with the FBI on June 17, 2024, Barnhill lied to the FBI when he reported that police officers let him inside the Capitol Building.

The Court must also consider that the Barnhill's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Barnhill's crime support a sentence of 21 days' incarceration and 36 months' probation.

## II.    Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1-1.

### Barnhill's Role in the January 6, 2021, Attack on the Capitol

On January 5, 2021, Brandon Barnhill traveled from Louisiana to Washington D.C. to attend the then-president's rally. After attending the rally, Barnhill traveled with the crowd to the United States Capitol. (*Image 1*).



*Image 1: Barnhill, circled in yellow, traveling to the Capitol following the then-president's rally.*

At approximately 2:30 p.m., Barnhill arrived on the Capitol's West Front. (*Image 2*). At this location, Barnhill observed the developing riot, including rioters yelling at police officers. Barnhill described the situation as "calm, until it wasn't." Although he was not directly sprayed by police officers, Barnhill felt the overwhelming effects of chemical irritants in the air that police officers deployed to quell the riot.



*Image 2: Barnhill on the West Front with other rioters.*

From there, Barnhill climbed to the Upper West Terrace. Once on the Upper West Terrace, Barnhill traveled to the Upper West Terrace Door at the center of the Capitol. Barnhill entered the Capitol through this door at approximately 2:45 p.m., nearly one minute before officers physically prevented rioters from entering the Capitol at this location. *(Image 3)*.



*Image 3: Barnhill entering the Capitol.*

After Barnhill entered the Capitol through the Upper West Terrace Door, Barnhill walked

through a hallway and climbed a set of stairs leading to the Capitol Rotunda at approximately 2:46

p.m. Once Barnhill reached the Rotunda, he remained in the Rotunda for several minutes carrying

a cell phone and recording the scene around him. (*Image 4*).



*Image 4: Barnhill in the Rotunda.*

At approximately 2:48 p.m., Barnhill entered the East Foyer. He briefly traveled back to the Rotunda twice after entering the East Foyer, each time returning to the East Foyer. Additionally, while in the East Foyer, Barnhill smoked a substance. (*Image 5*)



*Image 5: Barnhill smoking in the East Foyer.*

Shortly thereafter, at approximately 2:53 p.m., Barnhill departed the Capitol through the East Doors. However, Barnhill remained on Capitol grounds, and, in total, spent over two hours on Capitol grounds during the riot on January 6, 2021.

*Barnhill's Interview*

In a pre-arrest interview on June 17, 2024, Barnhill spoke with the FBI about his actions on January 6, 2021. During that interview, Barnhill claimed that when he entered the building at 2:45 p.m., a police officer, or a person appearing to be a police officer, held open the Upper West Terrace door and gave him permission to enter the building. Barnhill acknowledges this representation to the FBI was false and he knew it was false during the interview. Barnhill also acknowledged during the same interview that the person appearing to hold the door did not have a visible badge or any insignia that would indicate they were law enforcement. Additionally, as

United States Capitol Police Closed-Circuit Television ("CCTV") makes clear, police officers were not holding the Upper West Terrace door open as Barnhill entered the Capitol building.

*The Charges and Plea Agreement*

On September 4, 2024, the United States charged Barnhill by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). This Court has scheduled Barnhill's plea and sentencing hearing for December 5, 2024. Barnhill has agreed to pay $500 in restitution to the Architect of the Capitol as part of his plea.

### III.  Statutory Penalties

Barnhill now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Barnhill faces up to six months of imprisonment and a fine of up to $5,000. Barnhill must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' incarceration and 36 months' probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

*v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Barnhill's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Barnhill, the absence of violent or destructive acts is not a mitigating factor. Had Barnhill engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Barnhill's case is his decision to advance on Capitol grounds and eventually enter the Capitol after observing the chaos around him, including rioters becoming aggressive with police officers and the presence of chemical irritants in the air. Despite these unmistakable signals to leave, Barnhill stayed on Capitol grounds. Barnhill was a member of the mob both inside and outside of the Capitol. As he participated in the riot, Barnhill observed the mob's actions, including rioters overrun the Capitol as the mob around him climbed scaffolding from the West Front to the Lower and Upper West Terraces. After he entered the Capitol, he roamed around the Capitol with a friend, near the Rotunda and East Foyer, relishing in the mob's actions inside the Capitol. Barnhill proceeded to smoke a substance inside the Capitol before leaving. Once he left the Capitol, he remained on Capitol grounds for a significant period. During a subsequent interview with the FBI, he offered the FBI a false narrative for entering the Capitol to mitigate his actions.

Accordingly, the nature and the circumstances of these offenses establish the clear need for a sentence of incarceration.

**B. Barnhill's History and Characteristics.**

Barnhill is a 24 year-old resident of Louisiana. He is employed by Hornbek Off-

Shore Services.[3] The Government did not receive a presentence report in this case and is therefore unable to offer the Court additional context on Barnhill's background.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

---

[3] Hornbeck Offshore Services operates offshore supply vessels, multi-purpose support vessels, and a shore-base facility to provide logistical support and specialty services to the offshore oil and gas and production industry, primarily in Gulf of Mexico.

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Barnhill's case presents several aggravating factors worthy of incarceration. This Court should fashion an appropriate sentence, accordingly.

As Barnhill arrived on Capitol grounds, the actions of the mob offered obvious indications that he should have left. He did not. He observed the chaos and aggression by rioters against officers. He felt the chemical irritants in the air and saw rioters climbing scaffolding to reach the various terraces on the west side of the Capitol as the mob advanced on the Capitol. He joined this advance and entered through the Upper West Terrace Doors.

Barnhill had no authority to enter the Capitol. Yet, he falsely told the FBI that someone he thought was a police officer held open the Upper West Terrace door and gave him permission to enter the building. Barnhill knew this was a lie. No police officer allowed Barnhill to enter the building. On his own volition, he moved through the building, knowing he had no authority to enter. He moved around the Rotunda as an active participant in the ongoing melee. After entering the East Foyer, Barnhill smoked a substance in the East Foyer, indicative of the brazenness of his actions and disrespect for the Capitol. After he left the Capitol, he did not leave. The Court must sentence Barnhill in a manner sufficient to deter him specifically, and others generally, from participating in political rioting again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[4] This Court must sentence Barnhill based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

On December 5, 2024, Barnhill will plead guilty to both Counts of the information charging him with disorderly or disruptive conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count One) and parading, demonstrating, or picketing in any Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 2). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Michael McCormick*, 21-cr-710, Judge Chutkan sentenced the defendant to 14 days' incarceration for similar conduct. While McCormick pled guilty to 18 U.S.C. § 1752(a)(1), McCormick, like Barnhill, approached the Capitol despite observing police protecting the building and "tear gas chocking the air." Both defendants were not deterred by what they observed. McCormick traveled to the Upper West Terrace and entered the Capitol at 2:55 p.m., approximately 8 minutes after Barnhill entered the Capitol through an adjacent entrance on the Upper West Terrace. McCormick and Barnhill remained in the Capitol for approximately 8 minutes and recorded their actions, and those of other rioters, on their phones. Barnhill and McCormick also attempted to deceive the FBI during their respective investigations. McCormick deleted pictures he took on January 6 from his phone after the FBI contacted him. Barnhill was not forthright with the FBI when discussing his initial entrance into the Capitol. Barnhill warrants a similar sentence, consistent with our recommendation.

Another case that offers similar facts for this Court's consideration is *United States v. Ruben Reyna*, 23-cr-350 (CKK). While Reyna also entered a guilty plea on one count of 18 U.S.C. § 1752(a)(1), Reyna, like Barnhill, arrived at the Capitol on the West Front. Both defendants acknowledged that they saw a chaotic and deteriorating scene as they approached the building. As Reyna approached, he described a "threshold that should not be crossed." As Barnhill stood with the mob on the West Front, he described the situation as, "calm, until it wasn't." Yet, both defendants did not heed these warning and leave – they continued to advance. Both Reyna and Barnhill entered the Capitol with a friend. While Reyna climbed through a window along the senate wing, he did not move deeper into the building after he entered. He left the building after approximately one minute and remained on the Upper West Terrace for approximately 10 minutes thereafter. In contrast, Barnhill continued to move through the building and into the Rotunda

before leaving through the East Rotunda Doors. Reyna and Barnhill both submitted to subsequent interviews with the FBI where both defendants offered misleading narratives for their initial entry into the Capitol. Judge Kollar-Kotelly sentenced Reyna to the government's recommendation of 14 days' incarceration and 12 months' probation. ECF 25 (Sentencing Memorandum), 34 (Judgment).

*United States v. Leticia Ferreira*, 22-cr-210, offers the Court another comparator where Judge Chutkan imposed a 14-day incarceration sentence following a plea to 40 U.S.C. § 5104(e)(2)(G) for a defendant who was undeterred by tear gas after observing the angry mob at the Capitol. Ferreira spent approximately 45 minutes in the Capitol after observing officers deploy tear gas against the mob. While Barnhill spent approximately 8 minutes in the Capitol, he remained on Capitol grounds for over two hours. Also, Ferreira, like Barnhill, was not entirely truthful about her participation in the riot when interviewed by the FBI.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Barnhill must pay $500 in restitution, which reflects in part the role Barnhill played in the riot on January 6.[6] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

has since been updated by the Architect of the Capitol, USCP, and MPD.) Barnhill's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Barnhill to 21 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence promotes respect for the law and deters future crime by imposing restrictions on Barnhill's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Eli J. Ross*
Eli J. Ross
Assistant United States Attorney
Illinois Bar Number 6321411
United States Attorney's Office
601 D. Street, N.W.
Washington, D.C.  20001
Telephone: (202) 297-1515
Email: Eli.Ross@usdoj.gov